RUSSELL T. MONAHAN USB NO. 9016
COOK & MONAHAN, P.C.
Attorneys for Plaintiff
230 South 500 East, Suite 465
Salt Lake City, Utah  84102
Telephone:  (801) 595-8600
Telefax:  (801) 595-8614
E-Mail:  russ@cooklawfirm.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| JUSTIN JOHNSON<br><br>Plaintiff,<br><br>vs.<br><br>SALT LAKE CITY SCHOOL DISTRICT, TIFFANY SANDBERG, MELISSA FORD, MICHAEL NEMELKA, KATHERINE KENNEDY, NATE SALAZAR, SAMUEL HANSON, KRISTI SWETT<br><br>Defendants. | **COMPLAINT**<br><br><br>Civil No: 2:19-cv-00743 JNP<br><br>Judge: JILL N. PARRISH<br>Magistrate:<br><br>JURY DEMAND |

**JURISDICTION AND VENUE**

1. This action is brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 et. seq., as amended, and the Age Discrimination in Employment Act of 1967 (hereinafter ADEA), 29 U.S.C. §621, et. seq. for employment discrimination and retaliation. Jurisdiction is specifically conferred upon this Court under and by virtue of 42 U.S.C. § 2000e(5) and 29 U.S.C. §626(c).

1

2.	Venue of this action is proper in the Central Division pursuant to 28 U.S.C. 1391, in that the Plaintiff and Defendants reside in this District and a substantial part of the events giving rise to the Plaintiff's claims arose within this District.

3.	On July 30, 2019, the United States Department of Justice issued a Right To Sue Letter authorizing the Plaintiff to initiate proceedings in an appropriate court of competent jurisdiction. A copy of said notice is attached hereto as Exhibit A and incorporated by reference herein.

**PARTIES**

4.	Plaintiff is a resident of the County of Salt Lake, State of Utah and a former employee of Defendant Salt Lake City School District.

5.	Defendant Salt Lake City School District is a School District of the State of Utah pursuant to 53A-2-101 et seq. and is an employer within the meaning of the 42 U.S.C. 2000e(b) and 29 U.S.C. § 630(b).

6.	Defendant Tiffany Sandberg is the President of the Board of Education of Salt Lake City School District. Defendant Sandberg is sued as an individual and in her official capacity.

7.	Defendant Melissa Ford is the Vice President of the Board of Education of Salt Lake City School District. Defendant Ford is sued as an individual and in her official capacity.

8.	Defendant Michael Nemelka is a member of the Board of Education of Salt Lake City School District. Defendant Nemelka is sued as an individual and in his official capacity.

9. Defendant Katherine Kennedy was a member of the Board of Education of Salt Lake City School District. Defendant Kennedy is sued as an individual and in her official capacity.

10. Defendant Nate Salazar is a member of the Board of Education of Salt Lake City School District. Defendant Salazar is sued as an individual and in his official capacity.

11. Defendant Samuel Hanson is a member of the Board of Education of Salt Lake City School District. Defendant Hanson is sued as an individual and in his official capacity.

12. Defendant Kristi Swett is a member of the Board of Education of Salt Lake City School District. Defendant Swett is sued as an individual and in his official capacity.

## GENERAL ALLEGATIONS

13. Plaintiff was employed by Defendant Salt Lake City School District (hereinafter Defendant SLCSD) in their facilities services department starting in December 2015. Plaintiff achieved career status on July 1, 2016.

14. Plaintiff was initially employed as a groundskeeper. Shortly after Plaintiff was hired, Plaintiff's initial supervisor Burt Still named Plaintiff Lead Groundskeeper, however at that time, Plaintiff didn't receive any title or wage increases. Plaintiff was officially promoted to Interim Lead Groundskeeper in March, 2017 with a subsequent increase in pay. The Interim title was removed in October 2017 and Plaintiff was made the Lead Groundskeeper.

15. Plaintiff's direct supervisor initially was Burt Still and then around June 2017 Chris Miller was made the Plaintiff's direct supervisor.

16. Miller's direct supervisor was Curtis Barnett.

17. Plaintiff met multiple times with Barnett while Plaintiff was employed by Defendant SLCSD to discuss the work performance of the crews.

18. Some of these meeting were also attended by Daniel Berry.

19. During these meetings, Barnett indicated that he wanted Plaintiff and Berry to provide reasons to write up two employees, Ray Seerles and Gus Bablous. Both were long time employees over the age of 40 and were nearing retirement age. Barnett indicated that the employees were too old and slow and that he wanted to get rid of them.

20. Plaintiff told Barnett that he did not agree with Barnett's assessment of the employees' skills.

21. Berry initially did provide feedback to Barnett for write ups however Berry ceased to provide the information once he determined that it was poisoning his relationship with his co-workers.

22. After Berry stop providing information, he soon found himself subject to reprimands.

23. After Barnett initially requested reasons to write up the older co-workers, Plaintiff reported Barnett's request to his direct supervisor Still.

24. Still indicated that he was also receiving pressure from Barnett to write up employees.

25. When Miller became Plaintiff's direct supervisor one of his initial actions was to place Seerles and Bablous under the direction of Plaintiff.

26. At that time, Miller instructed Plaintiff that he needed to write up Seerles and Bablous. Miller stated that these instructions came from Barnett. Plaintiff expressed his disagreement with targeting Seerles and Bablous to Miller.

27. Miller continued to pressure the Plaintiff to find reasons to discipline Seerles and Bablous throughout the fall and early winter of 2017. Miller's pressure was constant and always aimed at Seerles and Bablous. Miller did not seek reasons to write up other members of Plaintiff's crew.

28. Finally, in January or early February of 2018, Miller ordered Plaintiff to provide reasons to write up Seerles and Bablous or otherwise Plaintiff would also be subject to discipline. Again, the Plaintiff refused Miller's demand because Plaintiff believed there was no basis for Miller's demand.

29. Also around the end of January 2018, Plaintiff and a female co-worker, Chay Olsen were clocking out. As they were clocking out, Barnett came down the hallway. As Barnett passed by Olsen, Barnett told her that he was watching her all day on the security cameras. When Plaintiff and Olsen were outside, Olsen confided in Plaintiff that she thought Barnett's comment was creepy.

30. The next week, around February 5, 2018, Olsen express more concern over Barnett's comment to Plaintiff. Olsen seemed visibly upset by the comment to the point that she was crying. Olsen told Plaintiff that she didn't feel comfortable at work knowing that she was being watched all day by Barnett. Plaintiff agreed with Olsen that he believed the comment to be inappropriate.

31. Plaintiff instructed Olsen to speak to Human Resources about Barnett's comments.

32. Because of Olsen's complaint and because of Barnett's prior request to manufacture reasons to write up older employees, Plaintiff decided to take these issues to H.R. himself.

33. Shortly after the Olsen incident, Plaintiff telephoned H.R. Specialist Amy O'Connor.

34. Plaintiff explained the nature of his concerns to O'Connor. Plaintiff specifically told O'Connor about the Olsen incident. Plaintiff specifically told O'Connor that the matter involved Barnett.

35. O'Connor indicated that she did not have any time to discuss the Plaintiff's concerns in depth at that time, but Plaintiff and O'Connor agreed to meet on February 15, 2018 to go over the Plaintiff's concerns.

36. O'Connor indicated that Plaintiff's complaints would be kept confidential until an investigation could be conducted.

37. After Plaintiff's telephone conference with O'Connor, Plaintiff received a letter in the mail from H.R. indicating that Plaintiff was no longer a career status employee. Plaintiff was informed that he was reduced to provisional status as of October 16, 2017 because of a position the Plaintiff held since March 27, 2017. The letter was dated February 6, 2018, but it was not sent to the Plaintiff until February 12, 2018.

38. Plaintiff also contacted his representative with Utah Public Employees Association, Sam Mills. Plaintiff explained the issues to Mills and requested his attendance at the meetings.

39. The day of the scheduled meeting, O'Connor contacted Plaintiff and told him that she needed to reschedule their initial meeting. O'Connor told Plaintiff that she would contact him later to reschedule. O'Connor re-scheduled at least two additional meetings and then cancelled them.

40. On March 5, 2018 Plaintiff was given a written reprimand by Miller. The written reprimand was dated March 1, 2018.

41. Plaintiff was at work on March 1 and 2. While at work, Plaintiff conversed with Miller multiple times, however Miller never indicated that Plaintiff was going to receive a written reprimand.

42. After receiving the written reprimand, Plaintiff immediately contacted O'Connor and demanded a meeting.

43. Plaintiff met with O'Connor on March 8, 2018.

44. During their meeting, Plaintiff informed O'Connor about problems and issues in the facilities services department.

45. Plaintiff specifically raise Barnett's inappropriate comments to Olsen along with Barnett's expressed desire to remove older employees from the workforce.

46. Plaintiff raised the issue of targeting older employees.

47. O'Connor indicated that she had known Barnett for a long period of time. O'Connor stated her belief that Barnett's comments to Olsen and about discipline were being

misconstrued. O'Connor stated that she would talk to Barnett. O'Connor did not indicate that any investigation would be conducted. O'Connor did not request a written statement from Plaintiff.

48. Shortly after meeting with O'Connor, Plaintiff noted that Miller was questioning members of his crew about who potentially went to H.R. with complaints.

49. Plaintiff knew that a member of his crew had separately also complained to H.R.

50. Miller was also aware that Plaintiff had been to H.R. because Plaintiff went during business hours. Plaintiff was required to report his whereabouts during all work hours. Plaintiff informed Miller the morning of the H.R. meeting that Plaintiff had a meeting with H.R. that day.

51. On March 13, 2018, Plaintiff provided a written response to the Letter of Reprimand issued by Miller.

52. When Plaintiff provided a copy of his response to O'Connor, Plaintiff was informed that his response was of no consequence and that Letters of Reprimand could not be contested.

53. Plaintiff arranged for another meeting with O'Connor to discuss retaliation on April 5, 2018. That meeting was then cancelled by O'Connor on the day of the meeting and rescheduled for April 20, 2018.

54. After O'Connor cancelled their meeting, Plaintiff received a call from an associate who also knew Barnett. The associate indicated to Plaintiff that he was talking with Barnett and after their conversation, he had the impression that Barnett wanted to terminate Plaintiff. The associate indicated that he was just trying to give Plaintiff a heads up.

55. On April 16, 2018, Plaintiff received a second Letter of Reprimand back dated to April 3, 2018.

56. On April 20, 2018, O'Connor cancelled the second meeting with Plaintiff.

57. On April 24, 2018, Plaintiff provided a written response to the April 16, 2018 Letter of Reprimand.

58. On April 26, 2018, Plaintiff finally had his follow up meeting with O'Connor.

59. On April 30, 2018, Plaintiff was informed by letter from Ricardo Zubiate that his contract would not be renewed. Plaintiff's last day of work was scheduled to be June 30, 2018.

60. The non-renewal of the Plaintiff's contract was in violation of the policies of Defendant SLCSD. The letter from Zubiate contained both factual and legal inaccuracies.

61. On May 11, 2018, Plaintiff filed an internal complaint with the Defendant SLCSD alleging retaliation.

62. After filing the complaint, Plaintiff had several contacts with the Defendant SLCSD H.R. Director, Byron Garritson.

63. Approximately two weeks after filing his complaint, Plaintiff called Garritson to find out the status of Plaintiff's complaint. During their conversation, Garritson provided no insight into the status of the investigation. Garritson did however become aggressive and belligerent towards the Plaintiff. Garritson accused the Plaintiff of being the problem. Plaintiff told Garritson that if he was going be confrontational, then the Plaintiff preferred not to speak with him. At that, the Plaintiff ended the phone conversation.

64. Later that day, Garritson appeared at the Plaintiff's worksite, East High School. Garritson approached the Plaintiff in an aggressive manner. Garritson again told Plaintiff that

Plaintiff was the problem. Plaintiff again told Garritson that Plaintiff was not going to speak to him if he was going to yell. Garritson then left.

65. After Plaintiff filed his formal complaint, Plaintiff met with Garritson. During their meeting, Garritson asked the Plaintiff if he had any information to provide. Plaintiff responded by providing additional information on racial incidences concerning Barnett.

66. On June 20, 2018, pending the termination of his employment on June 30, 2018, Plaintiff resigned his employment for Defendant SLCSD to take a position with another employer.

67. On August 7, 2018, after not having heard anything from the Garritson, Plaintiff filed a complaint with the EEOC.

68. On September 12, 2018, Defendant SLCSD provided a response to the Plaintiff's EEOC complaint.

69. On September 18, 2018, Defendant SLCSD issued a draft Report on the Plaintiff's May 11, 2018 complaint.

70. The draft report contained factual inaccuracies. Further, Plaintiff has learned that the investigator for Defendant SLCSD repeatedly failed to ask witnesses relevant questions about the Plaintiff's allegations. Witnesses also indicated that statements attributed to them were not accurately reflected in the draft report.

71. The draft report deliberately contained misrepresentations of the Plaintiff's allegations so as to minimize the allegations.

72. For instance, the Draft Report lists one of the Plaintiff's allegations as follows: "Barnett has a license plate on his personal vehicle that seems offensive. The plate states "hang

em." Complainant stated that Barnett used terminology as "the new sheriff in town" and felt like Barnett wanted to terminate employees." Draft Report page 8. The Draft Report then dismisses the allegation finding that Barnett has a drywall company named "Hang Em High".

73. During Plaintiff's conversation with Garritson after Plaintiff filed his formal complaint, the license plate came up as a side note to a more serious accusation. Plaintiff informed Garritson of an incident in the summer of 2017. Plaintiff told Garritson that an African American employee named Tyrone had retired from the school district. His co-workers held a farewell party for him. Barnett walked out of the party into a waiting room where Plaintiff, Searles and Kevin Bailey were present and made the comment; "I guess we can say nigger now that he is gone". Plaintiff the added that he thought that was the reason that Barnett had a license plate that read "hang em". Garritson's Draft Report deliberately avoided the allegations of racially derogatory language by Barnett and instead focused on the license plate.

74. On July 30, 2019, the U.S. Department of Justice issued the Plaintiff a Right to Sue letter.

75. Plaintiff's actions in refusing to target older employees over the age of 40 were protected activities.

76. Plaintiff's actions in reporting the Olson issue and the requests from Barnet and Miller that Plaintiff target older employees over the age of 40 were protected activities.

## FIRST CAUSE OF ACTION
## RETALIATION, HOSTILE WORK ENVIRONMENT TITLE VII

77. Defendant SLCSD, through its employees, Miller, Barnet, Zubiate and O'Connor engaged in a pattern of behavior which constituted a hostile work environment directed at the Plaintiff in retaliation for Plaintiff's refusal to engage in discriminatory behavior.

11

78. The actions described above were demeaning, offensive and discriminatory and retaliatory to Plaintiff and were in violation of Title VII.

79. Defendant SLCSD was at all times aware of the hostile work environment and permitted it to permeate throughout the workplace.

80. As a direct and proximate result of Defendant SLCSD's wrongful conduct, Plaintiff has suffered loss of income, to date, plus interest, in an amount uncertain to date but in an amount to be demonstrated at trial.

81. As a further direct and proximate result of Defendant SLCSD's wrongful conduct, Plaintiff suffered severe emotional distress and anguish all to his damage in the amount of $200,000.00 or such other amount as may be demonstrated at trial.

82. Plaintiff is entitled to affirmative injunctive relief prohibiting Defendant SLCSD and the individually named Defendants from discriminating against individuals on the basis of their gender and age.

83. Plaintiff is entitled to reasonable attorney's fees and costs of court.

## SECOND CAUSE OF ACTION
## RETALIATION, HOSTILE WORK ENVIRONMENT ADEA

84. Defendant SLCSD, through its employees, Miller, Barnet, Zubiate and O'Connor engaged in a pattern of behavior which constituted a hostile work environment directed at the Plaintiff in retaliation for Plaintiff's refusal to engage in discriminatory behavior.

85. The actions described above were demeaning, offensive and discriminatory and retaliatory to Plaintiff and were in violation of ADEA.

86. Defendant SLCSD was at all times aware of the hostile work environment and permitted it to permeate throughout the workplace.

87. As a direct and proximate result of Defendant SLCSD's wrongful conduct, Plaintiff has suffered loss of income, to date, plus interest, in an amount uncertain to date but in an amount to be demonstrated at trial.

88. As a further direct and proximate result of Defendant SLCSD's wrongful conduct, Plaintiff suffered severe emotional distress and anguish all to his damage in the amount of $200,000.00 or such other amount as may be demonstrated at trial.

89. Plaintiff is entitled to affirmative injunctive relief prohibiting Defendant SLCSD and the individually named Defendants from discriminating against individuals on the basis of their gender and age.

90. Plaintiff is entitled to reasonable attorney's fees and costs of court.

## THIRD CAUSE OF ACTION
## RETALIATION, TERMINATION UNDER TITLE VII

91. At all times relevant, Plaintiff's actions were protected under Federal Title VII.

92. On April 30, 2018, Defendant SLCSD notified the Plaintiff that Defendant SLCSD was not renewing the Plaintiff's contract.

93. The actions of Defendant SLCSD were in retaliation for Plaintiff's exercise of his rights under Title VII.

94. As a direct and proximate result of Defendant SLCSD's wrongful conduct, Plaintiff has suffered loss of income to date, plus interest, in an amount uncertain to date but in an amount to be demonstrated at trial.

95. As a further direct and proximate result of Defendant Salt Lake County's wrongful conduct, Plaintiff suffered severe emotional distress and anguish all to his damage in the amount of $200,000.00 or such other amount as may be demonstrated at trial.

96. Plaintiff is entitled to affirmative injunctive relief prohibiting Defendant SLCSD and the individually named Defendants from retaliating against others in the exercise of their federally protected rights.

97. Plaintiff is entitled to reasonable attorney's fees and costs of court.

### FOURTH CAUSE OF ACTION
### RETALIATION, TERMINATION UNDER ADEA

98. At all times relevant, Plaintiff's actions were protected under ADEA.

99. On April 30, 2018, Defendant SLCSD notified the Plaintiff that Defendant SLCSD was not renewing the Plaintiff's contract.

100. The actions of Defendant SLCSD were in retaliation for Plaintiff's exercise of his rights under the ADEA.

101. As a direct and proximate result of Defendant SLCSD's wrongful conduct, Plaintiff has suffered loss of income to date, plus interest, in an amount uncertain to date but in an amount to be demonstrated at trial.

102. As a further direct and proximate result of Defendant SLCSD's wrongful conduct, Plaintiff suffered severe emotional distress and anguish all to his damage in the amount of $200,000.00 or such other amount as may be demonstrated at trial.

103. Plaintiff is entitled to affirmative injunctive relief prohibiting Defendant SLCSD and the individually named Defendants from retaliating against others in the exercise of their federally protected rights.

104. Plaintiff is entitled to reasonable attorney's fees and costs of court.

WHEREFORE, Plaintiff prays for relief and judgment against Defendant Salt Lake City School District and the individually named Defendants as follows:

1. For back pay, plus interest thereon at the appropriate legal rate from Defendant SLCSD.

2. For general damages in the amount of $200,000.00 or such amount demonstrated at trial from Defendant SLCSD.

3. For injunctive relief prohibiting Defendant SLCSD and the individual Defendants from violating Title VII and the ADEA.

4. For injunctive relief restoring Plaintiff to his previous position.

5. For interest, costs of court and a reasonable attorney's fees.

6. For such other and further relief as the court may deem fitting and proper in the premises.

7. Plaintiff demands a jury trial.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED: October 9, 2010.

                                                    */s/ Russell T. Monahan*
                                                    RUSSELL T. MONAHAN
                                                    Attorney for Plaintiff