FILED
2021 OCT 20 AM 11:22
CLERK
U.S. DISTRICT COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| JUSTIN JOHNSON,<br><br>        Plaintiff,<br><br>v.<br><br>SALT LAKE CITY SCHOOL DISTRICT,<br><br>        Defendant. | **MEMORANDUM DECISION AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:19-cv-743-JNP-DAO<br><br>District Judge Jill N. Parrish<br><br>Magistrate Judge Daphne A. Oberg |

Before the court is a motion for summary judgment filed by Defendant Salt Lake City School District ("SLCSD" or "Defendant") [ECF No. 40]. The court held oral argument on the motion on October 13, 2021. At the conclusion of the hearing, the court took the motion under advisement. After considering the written submissions and the arguments presented at the hearing, the court DENIES Defendant's motion for summary judgment.

## FACTUAL BACKGROUND

SLCSD hired Justin Johnson ("Johnson" or "Plaintiff") as a groundskeeper in its facilities department in December 2015. The district subsequently promoted Johnson to the role of lead groundskeeper, although the parties dispute the date on which this occurred. Johnson claims SLCSD promoted him in June 2016. SLCSD, in contrast, claims that it promoted Johnson to interim lead groundskeeper on March 27, 2017, and permanent lead groundskeeper on October 16, 2017.

Johnson's initial supervisor was Bert Steele ("Steele"). Johnson's skip-level supervisor was Curtis Barnett ("Barnett"). Prior to June 2017, Barnett pressured Johnson to provide reasons to write up two employees on his team who were nearing retirement age, Ray Searles and Gus Babalis ("Searles and Babalis"). Barnett indicated that the employees were too old and slow, and he wanted to get rid of them. Johnson reported this behavior to his supervisor, Steele. Steele told Johnson he had received similar pressure from Barnett. Around June 2017, Chris Miller ("Miller") became Johnson's supervisor. During the fall and winter of 2017, both Barnett and Miller again pressured Johnson to provide reasons to write up Searles and Babalis. Johnson repeatedly refused to comply. In January 2018, Miller instructed Johnson to provide reasons to write up Searles and Babalis or risk facing discipline himself. Again, Johnson refused.

During the same month, Johnson and Chay Olsen ("Olsen"), the only female groundskeeper, were clocking out. Barnett walked by and told Olsen that he watched her all day on the security cameras and that he liked watching her run around. Olsen told Johnson that she found Barnett's comment creepy. On February 5, 2018, Barnett held a grounds crew meeting where he told the crew he was watching them on the security cameras. This comment appeared to upset Olsen, who began crying after the meeting and again expressed discomfort with Barnett watching her.

When Olsen told Johnson that she felt uncomfortable at work knowing Barnett was using the security cameras to watch her, Johnson told Olsen to speak to Human Resources. But concerned that Olsen feared going to Human Resources herself, Johnson called SLC Human Resource Specialist Amy O'Connor ("O'Connor") on February 6, 2018. During the call, he explained the nature of his concerns with Barnett and requested a meeting with O'Connor. The

pair agreed to meet on February 13, 2018, to discuss the concerns in more depth. O'Connor later rescheduled the meeting for March 8, 2018.

In the meantime, Johnson received a letter from Byron Garritson ("Garritson"), SLCSD's Director of Human Resources, dated February 6, 2018, and postmarked February 12, 2018 ("Garritson Letter"). The letter informed Johnson that he had been on provisional status as of March 27, 2017. Under SLCSD's collective bargaining agreement, provisional employees receive fewer employment protections, and their contracts are reviewed for potential non-renewal at the end of the school year.

The parties dispute whether this was the first time Johnson heard about his provisional status. SLCSD claims that it placed Johnson on provisional status when he became an interim lead groundskeeper on March 27, 2017. SLCSD variously claims that it informed Johnson of his provisional status on March 27, 2017 or on October 16, 2017. *Compare* ECF No. 44-16 ("The district identified and notified you as of March 27, 2017 that the position was identified as substantially different from your previous role. This placed you in a new provisional period to be reviewed at this time."), *with* ECF No. 47-1, at 3 ("Johnson was informed by SLCSD HR Specialist Amy O'Connor that he was a provisional employee when the Interim title was removed in October 2017."). Johnson counters that he first discovered his provisional status when he received the February 2018 Garritson Letter. At minimum, Johnson is correct that the first contemporaneous written acknowledgement in the record of Johnson's provisional status occurred in the February 2018 Garritson Letter. [1]

---

[1] Provisional status lasts for one year of employment, plus the time through June 30. SLCSD's Common Agreement for Classified Employees states that once an individual achieves career status, she remains at that level, unless she is given a new position that is substantially different. As such, Johnson believed he was a provisional employee from December 2015 through June 30, 2016, and a career employee for all subsequent employment. The parties argue whether the

In addition to the Garritson Letter, in the time between when Johnson scheduled his first meeting with O'Connor and when the meeting actually occurred, Miller gave Johnson a written reprimand for insubordination, defiance, and negativity. Miller emailed O'Connor on March 5, 2018, requesting assistance with the written reprimand. The reprimand was dated March 1, 2018, and Johnson received it on March 5, 2018.

During the March 8, 2018 meeting with O'Connor, Johnson raised his concerns about Barnett's allegedly inappropriate comment to Olsen as well as the pressure from Barnett and Miller to provide reasons to write up the older employees on his team. On March 13, 2018, O'Connor informally notified Facility Services Director Ricardo Zubiate ("Zubiate") of Johnson's concerns. On March 16, 2018, O'Connor met with Miller and Barnett to begin the process of remediating Johnson's concerns.

Following Johnson's meeting with O'Connor, Miller questioned grounds crew members about who approached Human Resources with complaints. In light of what he perceived as Miller's retaliation, Johnson scheduled another meeting with O'Connor for April 5, 2018 to discuss the alleged retaliation. O'Connor rescheduled the meeting for April 26, 2018. In the meantime, Johnson received a second written reprimand from Miller for insubordination and

---

promotion to lead groundskeeper qualified as a "substantially different" position from his prior groundskeeper role. Johnson contends that the two roles were not substantially different and that SLCSD only sought to place Johnson on provisional status after his complaint. SLCSD argues that the promotion was a substantial change that merited provisional status. The court notes that Defendant has pointed to no evidence of communications or anything else at the time of the promotion that stated the new position made Johnson a provisional employee. Rather, all of the evidence adduced from the time of the promotion notes that the role is "interim." SLC SD 000036 ("Justin Johnson . . . is being placed in an Interim assignment."); *id.* 000198 ("Justin Johnson will be promoted as the Interim Groundskeeper Lead . . . ."). The first written discussion of Johnson's provisional status does not occur in the record until February 2018, in the Garritson Letter. The court does not resolve when SLCSD placed Johnson on provisional status; that is a question of fact for the jury to resolve.

loafing. This reprimand was dated April 3, 2018, but Johnson did not receive it until April 16, 2018.

On April 16, 2018, SLCSD made the final decision not to renew Johnson's contract. The parties dispute who made this decision. Plaintiff points to the SLCSD Report, which finds that Miller made the final decision to non-renew Johnson's contract, after consultation with Barnett and Zubiate. SLCSD relies on Zubiate's declaration, in which he states that he made the termination decision and issued the non-renewal letter. Regardless of who made the underlying decision, on April 30, 2018, Johnson received a letter from Zubiate informing him that SLCSD had declined to renew his contract for the following year. Zubiate stated that the district would not renew Johnson's contract because he "received written reprimands on March 1, 2018 and April 3, 2018 for insubordination and neglect of duty." ECF No. 44-16. Zubiate also noted that he "fel[t] you [Johnson] remain unwilling to work cooperatively with your Area Supervisor, Chris Miller." *Id.* Johnson's contract ended June 30, 2018.

On May 11, 2018, Johnson filed an internal complaint against Miller and Barnett alleging retaliation and bullying. In response, on September 24, 2018, SLCSD issued a report cataloging its findings regarding Johnson's allegations. On June 20, 2018, Johnson resigned from SLCSD and began working for a new employer. Johnson filed an EEOC complaint on August 7, 2018, and subsequently filed this lawsuit on October 9, 2019.

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Once the movant

has met this burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). When applying the summary judgment standard, the court must "view the evidence and make all reasonable inferences in the light most favorable to the nonmoving party." *N. Nat. Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008).

## ANALYSIS

## I.    EVIDENTIARY OBJECTIONS

Before determining whether Johnson's evidence of retaliation suffices to survive summary judgment, the court first addresses SLCSD's evidentiary objections. Under Federal Rule of Civil Procedure 56(c)(2), "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." But parties must object to the content, not the form, of the evidence. *See Johnson v. Weld Cnty.*, 594 F.3d 1202, 1210 (10th Cir. 2010) ("[W]hile *Celotex* indicates that the *form* of evidence produced by a nonmoving party at summary judgment may not need to be admissible at trial, the *content or substance* of the evidence must be admissible." (citation omitted)). Stated otherwise, Rule 56 "does not mean that [summary judgment] evidence must be submitted 'in a form that would be admissible at trial,'" so long as the underlying content can be submitted in an admissible form at trial. *Trevizo v. Adams*, 455 F.3d 1155, 1160 (10th Cir. 2006) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

At oral argument, Defendant argued that Johnson waived his opportunity to object to Defendant's evidentiary arguments. But Defendant did not raise its objections to Johnson's evidence until its reply brief, when Johnson no longer had an opportunity to respond absent a petition to the court for further briefing. And simply because a party does not respond to specific

evidentiary objections does not prevent the court from considering whether a piece of evidence is admissible. *See LaSalle Bank Nat. Ass'n v. Nomura Asset Cap. Corp.*, 424 F.3d 195, 205-06 (2d Cir. 2005) ("Even on summary judgment, a district court has wide discretion in determining which evidence is admissible . . . ."); *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009) ("[Q]uestions of admissibility are properly resolved by the court." (citation omitted)). In fact, during trials, this court regularly considers the admissibility of evidence without waiting for a response from the opposing party. The court will consider Defendant's evidentiary objections accordingly.

Defendant objects to nearly every piece of evidence submitted by Johnson. Yet Defendant's briefs provide little detail explaining why particular evidence constitutes hearsay or lacks foundation. Instead, SLCSD relies on conclusory objections that fail to allege how "the material cited . . . cannot be presented in a form that would be admissible in evidence." FED. R. CIV. P. 56(c)(2).

The court addresses these objections[2] but encourages parties to provide more thorough evidentiary objections in the future. The court reminds the parties that "[t]he objecting party must make its objection clear; the trial judge need not imagine all the possible grounds for an objection." *Angelo v. Armstrong World Indus., Inc.*, 11 F.3d 957, 960-61 (10th Cir. 1993). The

---

[2] The court focuses on Defendant's hearsay objections. But SLCSD also provides the following additional objections to various evidence submitted by Johnson: speculative/conclusory, lack of foundation, vague/lacks specificity, irrelevant/immaterial. First, Defendant's lack of foundation argument is unsupported. For the documents produced by Defendant, the act of production relieved Johnson of authenticating them. *See United States v. Doe*, 465 U.S. 605, 614 n.13 (1984) ("By producing the documents, respondent would relieve the [opposing party] of the need for authentication."). For the sworn declarations, witnesses may testify to matters about which the witness has personal knowledge. *See* FED. R. EVID. 602. Here, the facts stated in both declarations are based on the declarants' actual perception of events. Thus, the declarations do not lack foundation. To the extent any portion of the declarations are speculative, the court has disregarded that speculation. And finally, the court will, of course, disregard any evidence it deems irrelevant or immaterial.

7

court begins by discussing the investigative report, declarations, and business records generally, then turns specifically to Defendant's hearsay objections.

### A.    The Report, Declarations, and Business Records Generally

The court begins with the investigative report by SLCSD's Human Resources Department ("the Report"). SLCSD contends that the Report is inadmissible hearsay. ECF No. 47-2, at 33. Hearsay is an out-of-court statement offered into evidence to prove the truth of the matter asserted. FED. R. EVID. 801(c). The court disagrees with SLCSD and finds that the Report's conclusions, including the timeline as determined by the investigator, may be admissible at trial under a hearsay exception.

Federal Rule of Evidence 803(8)(B) provides that a report or statement of a public office is admissible if "the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness." Thus, an investigative report by a public office—like the public school district's report—is admissible, even if it states a conclusion or opinion, "[a]s long as the conclusion is based on a factual investigation and satisfies the Rule's trustworthiness requirement." *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 170 (1988). The Report contains sufficient indicia of trustworthiness to likely make it admissible at trial, and thus it is admissible for summary judgment purposes.

The court next considers the affidavits. Defendant objects to the affidavits submitted by Johnson and Babalis as hearsay. But parties can "submit affidavits in support of summary judgment, despite the fact that affidavits are often inadmissible at trial as hearsay, on the theory that the evidence may ultimately be presented at trial in an admissible form." *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006). Nonetheless, "the content or substance of the evidence must be admissible." *Thomas v. Int'l Bus. Machs.*, 48 F.3d 478, 485

(10th Cir. 1995). To the extent the affidavits discuss matters within the personal knowledge of their author—including out-of-court statements by the declarant—they are admissible for summary judgment purposes.

Finally, Defendant objects to consideration of various documents created by the school district. But Federal Rule of Evidence 803(6) outlines another hearsay exception that allows as evidence records kept in the course of regularly conducted business activities. Here, the administrative procedures and the collective bargaining agreement may both be admissible as excepted business records. *See Daniel v. Eaton Corp.*, 839 F.2d 263, 268 (6th Cir. 1988) (finding a collective bargaining agreement admissible under Rule 803(6)); *Wood v. Kinetic Sys., Inc.*, 766 F. Supp. 2d 1080, 1089 (D. Idaho 2011) (finding an employee handbook admissible under 803(6)); *Hogan v. Calvin-Smith*, No. CV 07-555-PK, 2008 WL 183077, at *4 (D. Or. Jan. 16, 2008) (finding an employee manual admissible under Rule 803(6)). Written reprimands and the non-renewal letter can also constitute business records. *See Parrish v. Roosevelt Cnty. Bd. of Cnty. Comm'rs*, No. CIV 15-0703 JB/GJF, 2017 WL 6759103, at *17 (D.N.M. Dec. 31, 2017) (admitting information from a personnel file under Rule 803(6) because "the personnel file is a business record"); *In re Air Crash Disaster at Stapleton Int'l Airport*, 720 F. Supp. 1493, 1499-1500 (D. Colo. 1989) (admitting into evidence personnel files under the business record exception).

### B.    *Hearsay Objections*

SLCSD makes general hearsay objections to all conversations relayed in the declarations and the Report, as well as statements made in emails among SLCSD employees. Defendant argued strenuously at oral argument that *Johnson v. Weld County* prohibited introduction of any hearsay evidence. But many of the supposed hearsay statements are not hearsay statements at all.

The declarations, the Report, and emails relay statements made by the following SLCSD employees: O'Connor, Miller, Barnett, Garritson, and Zubiate. These statements, although made by out-of-court declarants, are likely nonhearsay. Federal Rule of Evidence 801(d) directs that a statement offered against an opposing party and made by a party's agent or employee on a matter within the scope of that relationship and while it existed is not hearsay. Typically, "an employee's statements are not attributable to his employer as a party-opponent admission in an employment dispute unless the employee was 'involved in the decisionmaking process affecting the employment action' at issue." *Johnson*, 594 F.3d at 1209 (quoting *Jaramillo v. Colo. Jud. Dep't*, 427 F.3d 1303, 1314 (10th Cir. 2005) (per curium)). In this case, there is evidence that all five individuals were involved in the decision not to renew Johnson's contract. Therefore, the statements are not hearsay at all and thus "the content or substance of the evidence" is likely admissible at trial. *Johnson*, 594 F.3d at 1210 (emphasis omitted).

And the statements by Olsen included in Johnson's declaration and the Report are also nonhearsay. Hearsay is an out-of-court statement offered into evidence to prove the truth of the matter asserted. FED. R. EVID. 801(c). Whether Olsen actually found Barnett's comments creepy or whether they made her feel uncomfortable is irrelevant here; what matters is the effect Olsen's statements had on Johnson, causing him to complain to Human Resources.

This is not a case where the court "could get bogged down in a needless examination of the hypothetical ways the nonmoving party's evidence might be reduced to admissible form by the time of trial." *Johnson*, 594 F.3d at 1210. Rather, it is quite obvious to the court, through a straightforward application of the Federal Rules of Evidence, that much of the evidence that Defendant dismissed as hearsay is likely admissible nonhearsay.

The court will consider the aforementioned materials whose content may be presented in an admissible form at trial. To the extent the declarations, the Report, or the emails contain other hearsay statements, the court does not consider those statements. And, finally, the court need not consider O'Connor's telephone logs, O'Connor's meeting notes, nor Johnson's responses to the reprimands in ruling on this motion for summary judgment.

## II.    TITLE VII RETALIATION CLAIM

Johnson claims that Defendant retaliated against him by failing to renew his contract after he reported a supervisor for sexually harassing a co-worker. Defendant contends that it is entitled to summary judgment on Johnson's Title VII retaliation claim because (1) Johnson has no evidence of a causal connection between his sexual harassment complaint and his termination because Zubiate had no knowledge of the sexual harassment complaint when making the non-renewal decision, (2) even if Johnson could make out a prima facie case of retaliation, there is no evidence that SLCSD's proffered reasons for termination were pretextual, and (3) Johnson did not engage in protected conduct because he could not reasonably have believed that the conduct underlying the incident that he reported violated Title VII.

Title VII prohibits employers from discriminating against any employee "because he has made a charge, testified, assisted, or participated in any manner in a [Title VII] investigation." 42 U.S.C. § 2000e-3(a). Johnson makes no attempt to prove direct retaliation under Title VII. He instead relies on circumstantial evidence of retaliation. *See Jones v. U.P.S., Inc.*, 502 F.3d 1176, 1188 n.6 (10th Cir. 2007) ("A plaintiff may prove discrimination through either direct or circumstantial evidence."). Where a plaintiff relies only on circumstantial evidence to prove a Title VII claim, the court employs the three-step *McDonnell Douglas* burden-shifting framework to determine "whether a plaintiff's evidence raises an inference of invidious discriminatory intent

sufficient to survive summary judgment." *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008). First, the plaintiff must prove a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Once a plaintiff establishes a prima facia case, the burden shifts to the defendant to offer a legitimate, nondiscriminatory reason for its actions. *Id.* at 802-03. And finally, if the defendant succeeds in offering a nondiscriminatory reason, the plaintiff must demonstrate that the defendant's proffered reason was pretextual. *Id.* at 804-05.

### A. Prima Facie Case

To establish a prima facie case of retaliation, a plaintiff must demonstrate "(1) that he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006).

#### i. Protected Activity

The parties agree that Johnson reported Barnett's conduct towards Olsen internally to Human Resources. *Hertz v. Luzenac Am., Inc.*, 370 F.3d 1014, 1015 (10th Cir. 2004) ("Protected opposition can range from filing formal charges to voicing informal complaints to superiors."). But Defendant contends that Johnson's report did not qualify as protected activity because Johnson could not have reasonably believed that Barnett's conduct violated Title VII.

Courts have widely recognized that Title VII prohibits retaliation against whistleblowers even if the underlying conduct did not amount to a Title VII violation. Rather, the standard is whether a plaintiff had "a reasonable good-faith belief that the complained of activity violated Title VII." *Crumpacker v. Kan. Dep't of Hum. Res.*, 338 F.3d 1163, 1166 (10th Cir. 2003). As

defense counsel emphasized at oral argument, the "'reasonable good-faith belief' test has both subjective and objective components." *Clark v. Cache Valley Elec. Co.*, 573 F. App'x 693, 701 (10th Cir. 2014) (unpublished). Johnson clearly held a subjective belief that his complaint was reasonable. The only question, then, is whether Johnson's belief satisfies the objective prong. The court finds that his belief was objectively reasonable.

Defendant maintains that the fact that Johnson overheard only a single, potentially sexualized remark makes his belief that Barnett violated the law objectively unreasonable. Defendant correctly notes that both the Supreme Court and the Tenth Circuit have stated that single, isolated instances of inappropriate comments, unless extremely serious, will not rise to the level of actionable conduct under Title VII. *See, e.g.*, *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998); *Chavez v. New Mexico*, 397 F.3d 826, 832 (10th Cir. 2005). But, as noted above, the underlying conduct need not amount to a Title VII violation as long as Plaintiff had an objectively reasonable belief that the conduct he reported violated Title VII. Courts in this circuit have addressed—in the context of racial discrimination—whether it is objectively reasonable to believe that a single discriminatory remark violates Title VII. In such cases, courts have held that "an employee may bring a retaliation claim even though the employee reported the single use of a racial epithet outside of his presence, which generally falls short of actionable racial harassment." *Davis v. Gardner Turfgrass, Inc.*, No. 15-cv-743-JAP/WPL, 2016 WL 5172820, at *8 (D.N.M. July 29, 2016) (citing *Duran v. La Farge N. Am., Inc.*, 855 F. Supp. 2d 1243, 1250 (D. Colo. 2012) ("[I]t is reasonable for an individual without legal training to believe that the use of a racial slur in the workplace, even if it was an isolated incident and made outside his presence, violates Title VII.")). Here, Johnson reported a single sexualized comment directed at another employee in his presence. Although the comment may not rise to the level of sexual

harassment under Title VII, it is sufficient to establish an objectively reasonable belief that the speaker violated the law.

Defendant suggests that Barnett's conduct in this case equates to the underlying conduct in *Clark*, where the Tenth Circuit found it objectively unreasonable to believe that the underlying conduct violated Title VII. 573 F. App'x at 700-02. But the *Clark* case relied on the plaintiff's claim that the defendant favored a particular female employee for job assignments because he was romantically involved with her. Essentially, the complaint alleged favoritism based on what turned out to be a non-existent affair. The *Clark* plaintiff's complaints to supervisors included "conclusory statements about 'discrimination' or a 'hostile work environment'" but provided no evidence that he believed the employer was "engaged in gender discrimination" rather than simply favoring a single employee. *Id.* at 702. In contrast to the plaintiff in *Clark*, Johnson clearly believed that Barnett was engaged in gender discrimination and conveyed the sexual harassment that he observed to Human Resources. Sexual harassment, unlike favoring a single employee, is prohibited by Title VII. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 74 (1986) (Marshall, J., concurring) ("[S]exual harassment is illegal, and violates Title VII."). Johnson's report goes far beyond the mere "conclusory statements" that the Tenth Circuit rejected in *Clark*. Accordingly, the court rejects Defendant's comparison to *Clark*.

SLCSD's own anti-harassment policy further supports the objective reasonableness of Johnson's belief. SLCSD defines sexual harassment as

> [u]nwelcome sexual advances, requests for sexual favors, or other verbal or written communications or physical conduct of a sexual nature when . . . such conduct affects or has the purpose of unreasonably interfering with an individual's employment, education, or participating in a district-sponsored activity by creating an intimidating, hostile, or offensive working or learning environment.

ECF No. 44-14, at 3. Barnett's comment was clearly unwelcome. In fact, Olsen became visibly upset at Barnett's subsequent mention during a team meeting that he watched staff via the cameras. ECF No. 44-2 ¶ 28. Although Barnett's comment was not overtly sexual, Johnson reasonably interpreted it as verbal communication of a sexual nature. And, in Johnson's experience, the comment interfered with Olsen's working environment. As evidence, Johnson points to the fact that, when Barnett repeated similar language at a staff meeting, Olsen began to cry. ECF No. 44-2 ¶¶ 27-29. Thus SLCSD's own definition of sexual harassment could have led Johnson to the objectively reasonable belief that the comment constituted sexual harassment.

In sum, although Barnett's comment was not patently sexual, a jury could rationally find Johnson's belief that he reported legally prohibited sexual harassment objectively reasonable. Therefore, Johnson has met his burden of establishing that he engaged in protected opposition to discrimination.

### ii.    Adverse Employment Action

The parties do not dispute the second prong of Plaintiff's prima facie case. SLCSD issued a letter indicating that it would not renew Johnson's contract at the end of the school year. ECF No. 44-16. The non-renewal letter demonstrates a materially adverse employment action because "[a]ctions such as . . . terminations are by their nature adverse." *Roberts v. Roadway Exp., Inc.*, 149 F.3d 1098, 1104 (10th Cir. 1998).

### iii.    Causal Connection

Defendant argues strenuously that Johnson cannot establish a causal connection between his protected activity and his termination. Defendant claims that Zubiate—who Defendant alleges was solely responsible for Johnson's termination—could not have been motivated by retaliation because he had no knowledge of the protected activity. The court disagrees.

15

To begin, the evidence before the court, taken in the light most favorable to Plaintiff, casts serious doubt on Defendant's assertion that Zubiate had no knowledge of the protected activity. Zubiate's declaration attests that he had no knowledge of the protected activity when he determined the district would not renew Johnson's contract. ECF No. 40-3 ¶¶ 6-7. But the Report—in direct opposition to Zubiate's assurances—states that on March 13, 2018, O'Connor notified Zubiate of Johnson's complaint. ECF No. 44-3, at 12. The court cannot judge credibility on a summary judgment motion and must instead take the evidence in the light most favorable to the non-moving party. *Seamons v. Snow*, 206 F.3d 1021, 1026 (10th Cir. 2000) ("It is axiomatic that a judge may not evaluate the credibility of witnesses in deciding a motion for summary judgment." (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986))). Thus we assume Zubiate knew about Johnson's complaint no later than March 13, 2018. Within about a month, Zubiate decided to terminate Johnson.

Satisfying the causal connection element of a prima facie case of retaliation requires "evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *Burrus v. United Tel. Co. of Kan., Inc.*, 683 F.2d 339, 343 (10th Cir. 1982). And where "the adverse action occurs in a brief period up to one and a half months after the protected activity, temporal proximity alone will be sufficient to establish the requisite causal inference." *Conroy v. Vilsack*, 707 F.3d 1163, 1181 (10th Cir. 2013). As such, the close temporal proximity between when Zubiate learned of Johnson's complaint (March 13, 2018) and the decision to terminate Johnson (April 16, 2018) suffices, on its own, to raise the inference of causation necessary to establish a prima facie case of retaliation.

But even if a jury were to give credence to Zubiate's claim of ignorance, it could still reasonably rule for the Plaintiff on the causal connection prong. The evidence before the court

suggests that the decision to terminate Johnson did not originate from Zubiate. Rather, SLCSD's own report identifies Miller—not Zubiate—as the individual who decided not to renew Johnson's contract. ECF No. 44-3, at 16. Indisputably, Miller knew of Johnson's complaint prior to the April 16, 2018 decision not to renew Johnson's contract. Therefore, even assuming Zubiate knew nothing about Johnson's complaint, the record indicates the primary decisionmaker, Miller, knew about Johnson's conversations with Human Resources and was "pissed off" about it.[3] ECF No. 44-3, at 4. This is sufficient "evidence of circumstances that justify an inference of retaliatory motive." *Burrus*, 683 F.2d at 343.

An employee's burden to establish a prima facie case of retaliation is "*de minimis*"—she need only show the adverse employment action occurred "under circumstances which give rise to an inference of [retaliation]." *Plotke v. White*, 405 F.3d 1092, 1101 (10th Cir. 2005) (citation omitted). Accordingly, the court concludes that Johnson has met that burden.

### B.      Legitimate, Nondiscriminatory Reason

Because Johnson has met his initial burden of establishing a prima facie case, the burden shifts to SLCSD to produce a legitimate, nondiscriminatory reason for its adverse employment action. This "burden is exceedingly light . . . as [the Defendant's] stated reasons need only be legitimate and nondiscriminatory on their face." *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 970 (10th Cir. 2017) (citations omitted). Here, Defendant meets that burden by pointing to Plaintiff's poor job performance. *See Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1125 (10th Cir. 2005) ("Poor performance is a quintessentially legitimate and nondiscriminatory reason for

---

[3] The evidence also places O'Connor in the center of crafting Johnson's non-renewal letter and issuing the reprimands that ultimately led to Johnson's non-renewal. ECF Nos. 44-8, 44-11. O'Connor, of course, knew about Johnson's complaint prior to the non-renewal decision. Because Plaintiff has clearly established a causal connection, the court need not reach the question of whether the retaliatory motive originated with O'Connor, but it certainly raises another potential avenue for establishing a causal connection.

termination."). Zubiate's letter addressing Johnson states that he "ha[s] not made sufficient progress in my main areas of concern" because he "received written reprimands on March 1, 2018 and April 3, 2018 for insubordination and neglect of duty." ECF No. 40-2. Zubiate also pointed to Johnson's unwillingness to work cooperatively with Miller. *Id.* Defendant's provision of legitimate and nondiscriminatory reasons shifts the burden back to Johnson to show that Defendant's decision was pretextual.

### C.   *Pretext*

To establish pretext, Johnson must produce evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reason for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (citation omitted). Nevertheless, "[t]he plaintiff does not have the burden of proving a defendant's proffered reasons were false, or that a discriminatory factor was the 'sole' motivating factor in the employment decision." *Adamson v. Multi Cmty. Diversified Servs., Inc.* 514 F.3d 1136, 1146 (10th Cir. 2008) (citation omitted). Instead, the employee must show that unlawful intent was a "determining factor." *Id.* (citation omitted).

The court finds that Johnson has submitted sufficient evidence to raise an inference of pretext, which justifies turning the claim over to a jury. The court addresses the evidence of pretext into two categories: (1) alleged post-hoc fabrication of the written reprimands and provisional status; and (2) the credibility issues raised by the contradictions between evidence adduced by Plaintiff and Defendant.

i.        **Post-Hoc Fabrication**

Johnson's evidence raises a question as to whether the district engaged in post-hoc fabrication that led to his termination. A plaintiff can demonstrate pretext by adducing evidence that "allow[s] for an inference that the employer's proffered non-discriminatory reasons were either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." *Plotke*, 405 F.3d at 1102-03 (citation and alteration omitted). Johnson points to two potential post-hoc fabrications by Defendant.

Johnson first alleges that the written reprimands—which provided the rationale for his termination—are backdated. Defendant's backdating, Johnson claims, is meant to obscure the fact that Johnson's complaint, and not his poor performance, motivated the reprimands. The timeline supports Johnson's allegation of pretext. Johnson notified O'Connor of his concerns on February 6, 2018. The pair eventually met on March 8, 2018. In the interim, Johnson received the first reprimand referenced in his termination letter. The evidence submitted by Johnson indicates that Miller and O'Connor were in contact about the written reprimand between the time Johnson initially notified O'Connor of his complaint and when they actually met. And the evidence strongly suggests that Miller backdated the reprimand because the reprimand indicates that it was issued on March 1, 2018, despite the fact Miller emailed O'Connor requesting help with the reprimand on March 5, 2018.

The second written reprimand is especially problematic. Johnson scheduled another meeting with O'Connor for April 5, 2018. But O'Connor rescheduled the meeting for April 26, 2018. In the interim, Johnson received a second reprimand. This time, the reprimand was backdated such that it appeared to be issued before the scheduled April 5, 2018 meeting with O'Connor. In reality, Johnson received the reprimand over a week after his meeting with

O'Connor was originally scheduled. Backdating the reprimand to make it appear as though the reprimand occurred before Johnson shared his complaints with Human Resources would certainly support an argument of pretext. Thus the reprimands raise two questions of fact best resolved by a jury: Were the reprimands backdated? And, if so, was the backdating motivated by retaliatory intent?

Johnson raises a second potential instance of post-hoc fabrication, citing his placement on provisional status. SLCSD claims that it notified Johnson of his provisional status in 2017, although the district provides no contemporaneous evidence that Johnson was placed on or notified of his provisional status at this time. Johnson, conversely, declares that he first heard about his provisional status from the Garritson Letter that he received on February 15, 2018— just nine days after calling O'Connor and providing the basics of his complaint. The letter, perhaps not coincidentally, is dated on the same day that Johnson first called O'Connor, February 6, 2018. Taking the facts in the light most favorable to the non-moving party, this raises an inference that SLCSD sought to retroactively place Johnson on provisional status, after it learned of his complaint, in order to later terminate his contract more easily. This inference is bolstered by SLCSD's odd decision to spontaneously send a letter notifying Johnson of his provisional status over four months after the provisional status supposedly began and the lack of any documentation in his personnel file contemporaneously discussing the decision to place him on provisional status.

In fact, such "disturbing procedural irregularities can satisfy the requirements of a pretext claim." *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1219-20 (10th Cir. 2002) (citation omitted). In *Garrett*, an employer placed an employee in the lowest possible category for performance but failed to inform him of his new category until two months later. *Id.* at 1220.

While Johnson's placement on provisional status was not punitive, as was Garrett's placement in the lowest performance category, it certainly made his employment status more precarious. And in both cases, the employer waited months to inform the employee of his newfound status. A reasonable juror could conclude that the belated notification of Johnson's provisional status was a disturbing procedural irregularity—indicative of a post-hoc fabrication motivated by the complaint Johnson lodged just over a week before he received the letter.

### ii.     Credibility Issues

Finally, "[t]o raise an inference of pretext in the face of the employer's legitimate, nondiscriminatory explanation, the plaintiff must undermine the employer's credibility." *Jaramillo v. Colo. Jud. Dep't*, 427 F.3d 1303, 1310 (10th Cir. 2005); *see also Hare v. Denver Merch. Mart, Inc.*, 255 F. App'x 298, 304 (10th Cir. 2007) (unpublished) (holding that an employee can demonstrate pretext "by pointing to an apparent contradiction in the testimony of those involved in the decision to terminate [plaintiff]"). Zubiate's declaration plainly states that he was not aware of any complaints or reports made by Johnson concerning sexual harassment. Similarly, O'Connor openly declares that "[a]t no time whatsoever did I ever discuss or communicate in any way the Plaintiff's claims regarding Barnett's alleged comments to Olsen with SLCSD Facility Services Director Ricardo Zubiate." ECF No. 40-1 ¶ 7. Yet the Report details O'Connor's testimony to the investigator that "[o]n March 13, 2018, [O'Connor] informally notified Ricardo Zubiate . . . of the concerns expressed by Complainant on March 8, 2018." ECF No. 44-3, at 12. O'Connor and Zubiate's insistence on Zubiate's ignorance simply does not comport with evidence in the Report that O'Connor admitted that she met with Zubiate to discuss Johnson's complaint. This inconsistency severely undermines the credibility of Zubiate and O'Connor and supports an inference of pretext.

Defendant's evidence suffers from a further contradiction. Zubiate's declaration indicates that he made the decision whether to renew Plaintiff's contract. ECF No. 40-3 ¶ 5 ("These were the only issues I considered when making *my* determination to not renew the Plaintiff's provisional contract." (emphasis added)). Yet the Report finds that Miller, not Zubiate, made the final decision to not renew Johnson's contract. ECF No. 44-3, at 16. The Report indicates that Miller consulted with Zubiate and Barnett in making his decision. And the emails between O'Connor, Zubiate, and Garritson indicate that O'Connor and Garritson played an integral role in crafting the rationale that the district ultimately included in the termination letter. All of this evidence leaves the court perplexed as to who exactly made the termination decision and provided the termination rationale. But, of course, these are exactly the sort of questions of fact regarding pretext that are apt for resolution by a jury. For the purposes of the present stage of litigation, such contradictions raise serious credibility issues that are consistent with an inference of pretext. *Jaramillo*, 427 F.3d at 1310.

The credibility questions raised by the above contradictions militate in favor of denying summary judgment. Where a determination of whether an employer's stated reason for the adverse employment action is pretextual "turn[s] on the credibility of [employees in management positions] [s]ummary judgment is improper." *Birch v. West*, 870 F. Supp. 310, 316 (D. Colo. 1994); *see also Nat'l Aviation Underwriters, Inc. v. Altus Flying Serv., Inc.*, 555 F.2d 778, 784 (10th Cir. 1977) ("Affidavits are not a substitute for trial and summary judgment is improper where an issue turns on credibility as it did here."). The issue of who decided to refuse to renew Johnson's contract, and whether that person(s) knew about and/or was motivated by Johnson's protected activity, will be critical to the resolution of this case. The court refuses to act as the jury by determining witness credibility or choosing between competing inferences. It instead simply

determines that, viewing the evidence in the light most favorable to the Plaintiff, Johnson has met his burden of raising an inference that he experienced adverse employment actions because of his pursuit of his Title VII rights.

## III.   ADEA RETALIATION CLAIM

Johnson also brings a retaliation claim under the Age Discrimination in Employment Act ("ADEA"). 29 U.S.C. § 623(d). The ADEA prohibits employers from retaliating against employees who oppose age discrimination. *See id.* Johnson proceeds on his ADEA claim under two theories. First, he claims that he has provided direct evidence of retaliation under the ADEA. In the alternative, he claims that there is sufficient circumstantial evidence to support his ADEA retaliation claim under the *McDonnell Douglas* framework. Because the court finds that Johnson's claim survives under the *McDonnell Douglas* framework, it need not consider Johnson's direct evidence theory.

The *McDonnell-Douglas* framework for proving a retaliation claim under the ADEA mirrors the framework for proving an unlawful retaliation claim under Title VII. Defendant opposes Johnson's ADEA *McDonnell-Douglas* argument for two of the same reasons it opposed use of the burden shifting framework under Title VII. Specifically, Defendant argues it is entitled to summary judgment on Johnson's ADEA claim because (1) Johnson has no evidence of a causal connection between his age-related complaints and any adverse action towards him because Zubiate had no knowledge of the age-related complaint when making the non-renewal decision and (2) even if Johnson could make out a prima facie case of retaliation, there is no evidence SLCSD's proffered reasons for termination were pretextual. Defendant engaged in protected activity by complaining about Barnett and Miller's age discrimination at the same time he raised Barnett's comments to Olsen. Thus, for the same reasons discussed above, Defendant's

arguments fail. Johnson has identified sufficient evidence to raise a material issue of fact as to whether he can prevail on his ADEA retaliation claim under the *McDonnell-Douglas* burden shifting framework.

## CONCLUSION AND ORDER

For the foregoing reasons, Defendant's motion for summary judgment is DENIED.

DATED October 20, 2021.

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge